UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* MARCOS ARELLANO,<br><br>Plaintiff-Relator,<br><br>- against -<br><br>MYMOVE, LLC and RED VENTURES, LLC,<br><br>Defendants. | Civil Action No.: 3:20-cv-00255<br><br>FALSE CLAIMS ACT COMPLAINT |

*Qui tam* plaintiff and Relator Marcos Arellano, through his undersigned attorneys, hereby brings this action on behalf of the United States of America against MYMOVE, LLC ("MyMove") and its parent company, Red Ventures, LLC ("Red Ventures") (together with MyMove, "Defendants"). The claims asserted in this Complaint are based on the facts and information set forth below and upon information and belief, unless otherwise stated.

## NATURE OF THE ACTION

1. Relator sues Defendants to recover treble damages and civil penalties on behalf of the United States of America for misallocating employee time and expenses under Defendants' contracts with the United States Postal Service ("USPS") in order to fraudulently maximize their profits.

2. Defendants engaged in these frauds against the United States in violation of the False Claims Act, 31 U.S.C. § 3729 *et seq.* ("FCA").

1

3. Relator was a director of operations at Defendants Red Ventures and MyMove, and in that managerial role, Relator learned of Defendants' fraudulent schemes to defraud USPS of at least $2 million.

4. Relator reported this fraud to executives at Defendants, but they ignored his concerns and continued with their fraudulent schemes.

5. Defendants knew or should have known (as defined in 31 U.S.C. § 3801(a)(5)) that they were violating material terms of their contracts with USPS that directly and fraudulent reduced the amount of money Defendants were required to pay to USPS.

I. **Parties**

    A. **Relator – Marcos Arellano**

6. Relator Marcos Arellano is a resident of Charlotte, North Carolina.

7. Relator resided in Charlotte, North Carolina during his entire tenure of employment with Defendants.

8. From September 2016 to May 2018, Relator was a director of operations at Red Ventures focusing on its home security division.

9. In June 2018, Relator was transferred to MyMove where he was employed as a director of operations until April 2020, when he separated from the company.

10. Relator worked in MyMove's office located at 1101 Red Ventures Drive, Fort Mill, South Carolina.

11. Relator earned a bachelor's degree from North Carolina State in 2004, where he studied political science.

12. Relator earned a J.D. from New York University School of Law in 2007. He is an inactive member of the Georgia bar. He did not perform any legal services or provide any legal advice for Defendants.

13. Relator earned an M.B.A. from Duke University in 2015.

14. Relator enlisted and served in the Navy as a supply officer for the Navy's nuclear power program from 2010 until 2016.

### B. Defendant Red Ventures, LLC

15. Red Ventures is an American marketing company that acquires customers for brands in home services, financial services, and healthcare industries.

16. Red Ventures is incorporated in the State of North Carolina.

17. Red Ventures' principal place of business is 1101 Red Ventures Drive, Fort Mill, South Carolina.

18. Red Ventures is the parent company to MyMove, LLC.

19. In May 2015, Red Ventures acquired Imagitas, Inc. from Pitney Bowes, Inc. for $310 million.

20. In or around 2015, "Imagitas, Inc." converted to "Imagitas, LLC."

21. In or around 2017, "Imagitas, LLC" changed its name to "MYMOVE, LLC."

### C. Defendant MYMOVE, LLC

22. MyMove is a media company owned by Red Ventures with an exclusive partnership with USPS under which it connects retail companies with the approximately 39 million people who move ("movers") each year.

23. MyMove is incorporated in the State of Delaware.

24. MyMove's principal place of business is 1101 Red Ventures Drive, Fort Mill, South Carolina.

## II. Jurisdiction and Venue

25. This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1345 because this action involves a federal question and the United States is a plaintiff. This Court also has subject matter jurisdiction under 31 U.S.C. § 3732(a).

26. The Court may exercise personal jurisdiction over Defendants under 31 U.S.C. § 3732(a). The Court has personal jurisdiction over Defendants because they are found and transact business within this District. The Court has personal jurisdiction over Defendant Red Ventures because it resides in North Carolina.

27. Venue is proper in this District under 31 U.S.C. § 3732(a) because Defendants transact business and are found within this District, and Defendant Red Ventures resides in North Carolina.

28. This Complaint is not based on a public disclosure as defined in 31 U.S.C. § 3730(e). Relator sues as the original source of information regarding Defendants' violations of the FCA, given that Relator has direct and independent knowledge of the information on which the allegations are based and/or knowledge that is independent of and materially adds to any allegations or transactions that may have been publicly disclosed (although Relator knows of no such public disclosure).

29. No allegation in this Complaint is based on a public disclosure of allegations or transactions in a Federal criminal, civil, or administrative hearing in which the Government or its agent is a party; in a congressional, Government Accountability Office, or other Federal report, hearing, audit, or investigation; or from the news media. Rather, Relator is the original source.

### III. The Federal False Claims Act

30. Originally enacted in 1863, the FCA was substantially amended in 1986 by the False Claims Amendments Act. The 1986 amendments enhanced the Government's ability to recover losses sustained because of fraud against the United States.

31. The FCA imposes liability upon any person who "knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government," 31 U.S.C. § 3729(a)(1)(G), or conspires to do so, *id.* § 3729(a)(1)(C). Any person found to have violated these provisions is liable for a civil penalty of not less than $11,463 and not more than $23,331 for each such violation, plus three times the damages sustained by the Government.

32. The FCA imposes liability where the conduct is "in reckless disregard of the truth or falsity of the information" and clarifies that "no proof of specific intent to defraud" is required. 31 U.S.C. § 3729(b).

33. The FCA empowers private persons having information regarding a false or fraudulent claim against the Government to sue on behalf of the Government and to share in any recovery. 31 U.S.C. § 3730(b).

## FACTS

### I. MyMove's Business

34. MyMove is a contractor of USPS that participates in two programs: the "MoverSource Program" and the "MyMove Program."

5

### A. MoverSource Program

35. Under the MoverSource Program, USPS helps facilitate USPS's official change-of-address process.

36. One aspect of the MoverSource Program is familiar to many people: MyMove produces the packet of targeted advertising that movers receive at their new address after submitting change-of-address forms. (This packet is branded with the USPS logo, but produced by MyMove).

37. In total, MyMove performs three primary functions under the MoverSource Program: (1) MyMove maintains the USPS change-of-address website, including testing, optimization, and development; (2) it identifies, builds, and maintains relationships with marketing partners who wish to send print products to movers; and (3) it produces, with the help of a printing subcontractor, the print products (i.e., marketing materials) that are actually delivered to movers.

38. As detailed below, the MoverSource Program is governed by the "Alliance Agreement" between USPS and MyMove (the "MoverSource Agreement"), as amended.

39. MyMove shares ▮▮▮ of the *profit* from the MoverSource Program with USPS as provided by the MoverSource Agreement.

### B. MyMove Program

40. Under the MyMove Program, MyMove sells data it acquires from movers who are redirected to MyMove.com (a website owned and operated by MyMove) from USPS.com.

41. When movers finish submitting change-of-address forms at USPS.com, they are given the option of being directed to MyMove.com for additional services and marketing offers.

42. Once movers are transferred to MyMove.com, MyMove is able to sell their data to marketing partners. (Data from USPS.com, in contrast, is subject to many more privacy restrictions.)

6

43. The MyMove Program also includes a sub-program called the Solo Direct Mail Program (the "SDM Program").

44. The SDM Program allows MyMove clients (i.e., retailers) to send physical marketing materials through MyMove directly to movers who use MyMove.com.

45. The majority of production costs (i.e., non-personnel cost) associated with the MyMove Program arise from the SDM Program, which incurs most of the *physical* costs associated with the MyMove Program (i.e., paper, printing, and postage costs).

46. As detailed below, the MyMove Program is governed by the "Affiliate Agreement" between USPS and MyMove (the "MyMove Agreement"), as amended.

47. MyMove shares ▮▮▮ of the *revenue* from the MyMove Program with USPS.

### C. MyMove's Contracts with USPS

#### 1. *The MoverSource (Alliance) Agreement*

48. The MoverSource Agreement was first signed on May 22, 1995.

49. The MoverSource Agreement was first amended and restated on June 20, 2005.

50. During all relevant times, the MoverSource Program was governed by the Second Restated MoverSource Agreement (Alliance Agreement) dated December 17, 2010, as amended. The MoverSource Agreement was amended June 12, 2013; March 27, 2014; June 29, 2016; and July 19, 2019.

51. During all relevant times, the MoverSource Agreement provided that one "Benefit" of the MoverSource Agreement was "Profit Sharing," that is, "Sharing between the parties of profits generated from advertisements in the MoverSource Program materials."

52. During all relevant times, the MoverSource Agreement provided that "[USPS] and [MyMove] will split the net profits of the MoverSource Program for each calendar year." That net profit split required ▮▮▮ of the profits to go to USPS and ▮▮▮ of the profits to go to MyMove,

7

except that USPS was entitled to a payment of at least ▒▒▒▒▒▒ per year (the "Minimum Guarantee") as part of its profit share under the MoverSource Agreement. MyMove was required to pay any shortfall below the ▒▒▒▒▒▒ Minimum Guarantee to USPS.

53. During all relevant times, the MoverSource Agreement provided that net profits "are calculated using the following formula: Total revenues minus both approved direct expenses and indirect expenses as defined in sections 9.2 and 9.4."

54. During all relevant times, Section 9.2 of the MoverSource Agreement provided approved expenses of USPS.

55. During all relevant times, Section 9.4 of the MoverSource Agreement provided approved expenses of MyMove. It states:

> A MoverSource Program expense shall generally be determined to be reasonable if, in its nature and amount, it does not exceed that which would be incurred by a prudent person in the conduct of competitive business. No presumption of reasonableness shall be attached to the incurrence of expenses by [MyMove].... In order for an expense to be allowable, it must (1) be necessary and customary; (2) *be allocable to the MoverSource Program*; (3) conform with generally accepted accounting principles (GAAP); and (4) and [sic] satisfy any limitations set forth in this Agreement. An expense must meet all these tests to be allowable. Any allocation methodology that assigns an expense to the MoverSource Program will be reviewed and approved according to the annual budget process as described in Section 9.1.

(emphasis added)

56. During all relevant times, Section 9.4(a)(i) of the MoverSource Agreement provided:

> [MyMove] will budget and fully itemize estimated direct expenses *specifically identified* with the MoverSource Program. These expenses are generated *solely as a result of and to solely benefit the MoverSource Program*. [MyMove] personnel working on the MoverSource Program will be listed individually under a direct expense subcategory. [MyMove] will provide the basis of allocation to USPS.
>
> The categories of direct expenses generated solely by [the] MoverSource

8

Program activities will include, but may not be limited to:

...

 C. Direct employee compensation, including bonuses and severance;

 D. Direct expenses incurred in the process of selling MoverSource Program products;

....

(emphasis added)

57. During all relevant times, Section 9.4(a)(ii) of the MoverSource Agreement provided:

> Indirect expenses will be budgeted and itemized for all of [MyMove's] business, both separately and in consolidation with the MoverSource Program. These expenses represent corporate entity expenses, which are assigned to the MoverSource Program on a shared allocation basis. A portion of each indirect expense will be allocated to the MoverSource program based on methodologies reviewed and approved annually by USPS....
>
> Sufficient explanatory detail will be provided to allow USPS to evaluate and determine the reasonableness of each indirect expense and the method in which each expense is allocated to the MoverSource Program. Actual indirect expense detail and explanation of variances from budget will be provided as part of the quarterly financial statements...
>
> The following categories of expenses ... will *never* be allocated to the MoverSource Program:
>
>  i. **Costs that exist solely as a result of activities that support or benefit non-MoverSource Program business units**, and indirect costs that do not benefit or fulfill the work of the Alliance [that is, the partnership between USPS and MyMove under the MoverSource Agreement] or cannot be allocated to MoverSource Program in a reasonable proportion;
>
>  ...
>
>  xvi. **Costs relating to MyMove** [defined in the MyMove Agreement as the suite of programs offered "via a Web site with the URL of www.mymove.com (or any other derivative and related Web sites"]

....
(emphasis added)

58. During all relevant times, the MoverSource Agreement required MyMove to make profit-share payments to USPS quarterly based on the "actual results of the business."

59. During all relevant times, Section 9.1 of the MoverSource Agreement required MyMove to prepare a budget for the MoverSource Program in consultation with USPS.

60. During all relevant times, the MoverSource Agreement required MyMove to include income statements in the budget "based on a good faith estimate." The MoverSource Agreement also required that MyMove "ensure that the supporting cost data and pricing information are accurate, complete, and current, in all material respects, to the best of its knowledge and belief as of the date of submission [to USPS]."

61. During all relevant times, the MoverSource Agreement required the budget to include a "[p]roposed profit sharing payment schedule for the upcoming year, based on the expected revenues and profits" in the budget.

2. *The MyMove (Affiliate) Agreement*

62. The MyMove Agreement was first signed on December 17, 2010.

63. The MyMove Agreement was amended on June 29, 2016.

64. During all relevant times, Section 3.1 of the MyMove Agreement provided that MyMove will pay USPS "█████████████" of the Gross Revenue from Visitors and Abandoners" of MyMove.com.

65. During all relevant times, Section 3.1 of the MyMove Agreement defined Gross Revenue as "revenue actually collected by [MyMove] directly resulting from transactions on or through the MyMove Site [MyMove.com] by Visitors and Abandoners during the term of this Agreement less any applicable taxes, credits, returns, refunds or revenue from other sources."

10

66. During all relevant times, the MyMove Agreement defined "Visitor" to mean "a uniquely identified, new viewer, who has filed a Change of Address order with [USPS via the MoverSource Program] coming directly to the MyMove Site from the [USPS] Site(s) or another MoverSource Program."

67. During all relevant times, the MyMove Agreement defined "Abandoner" to mean a "uniquely identified, new viewer who has started but not fully completed the Change of Address process with [USPS via the MoverSource Program] coming directly to the MyMove Site from a Link shown specifically to movers who have abandoned the [USPS] change of address process."

68. During all relevant times, the MyMove Agreement provided that MyMove "will pay [USPS] ... ▮▮▮▮▮▮▮▮▮▮ of the Gross Revenue for each calendar month with thirty (30) calendar days after the end of each calendar month for all Commissions earned (total revenue share owed, as provided in Section 3.1...) and less any documented amounts for credits, returns, refunds or amounts not validly earned from proper use of the link(s) on the MyMove Site."

69. At no point did the MyMove Agreement allow MyMove to deduct its business costs (inter alia, costs from the SDM Program) from its revenue-share payments to USPS.

## II. Thwarted Fraud Attempt

70. Relator first became suspicious of fraudulent activity at MyMove when he discovered—and ultimately thwarted—an attempt by Defendants to defraud USPS of nearly ▮▮▮ ▮▮▮▮▮.

71. In the fall of 2019, MyMove was preparing its budget for 2020 when it learned that a major retail partner, Lowes, was pulling out of the MoverSource Program.

72. Without the revenue generated by Lowes, MyMove projected a precipitous decline in revenues that would cause the profit-share payment to USPS under the MoverSource

11

Agreement to fall ▮▮▮▮ short of the Minimum Guarantee. As a result, MyMove would have to pay this shortfall to USPS in 2020.

73. The general manager of MyMove, Matt Martin, told Relator and other MyMove employees that MyMove would not pay this shortfall. He told employees that if MyMove projected a ▮▮▮▮ payment to USPS under the MoverSource Agreement (i.e., ▮▮▮▮ short of the Minimum Guarantee), USPS would not realize the error.

74. Martin repeatedly urged MyMove employees, including Relator, not to mention the Minimum Guarantee issue to USPS, particularly in joint discussions with USPS about the 2020 budget.

75. Relator was concerned about the ethical and legal implications of this scheme and raised his concerns with Martin. (Relator was *not* acting in a legal capacity in interacting with Martin or Defendants, nor could Martin or Defendants reasonably believe that Relator was acting as their lawyer.) Relator emphasized that the usual culture at Red Ventures—where managers are pushed to be aggressive, take risks, and ask for forgiveness later—cannot be applied in the context of a government contract.

76. In or around October 2019, Martin told Relator that MyMove would pay the Minimum Guarantee if and only if USPS asked about it.

77. Martin also told Relator that he would attempt to justify MyMove's failure to pay the Minimum Guarantee based on an invented, bad faith interpretation of the MoverSource Agreement: He would argue that the postage MyMove pays for its operations generates "profit" to USPS under the MoverSource Agreement, mitigating the shortfall. (MyMove pays well over $5 million in postage each year.) Martin knew that this interpretation of the MoverSource Agreement was wrong and made in bad faith, and he intended to convey it to USPS only as a means of saving face if USPS caught on to MyMove's failure to pay the Minimum Guarantee.

78. Payments MyMove makes for postage have never been considered "profit" to USPS under the MoverSource Agreement. (Nor can payments made for postage be "profit" to USPS because USPS incurs high costs to deliver mail.)

79. Before Martin could go through with his plan for 2020, MyMove realized that revenues in 2019 had declined so much over the projected 2019 budget that MyMove would be ▮▮▮▮▮▮▮ short of the Minimum Guarantee in 2019. With 2019 nearly over, this meant MyMove had to make a decision about how to deal with the shortfall in the Minimum Guarantee much sooner than expected (given that it had not expected to face the problem until 2020's expected ▮▮▮▮▮▮▮ shortfall).

80. In or around December 6, 2019, Relator again raised his concerns with Martin and asked Martin to consult with the legal department. Martin insisted that the decision for how to deal with the shortfall was "a business decision, not a legal decision," and told Relator not to get involved. He also assured Relator that Jeff Hallock (Martin's boss, President at Red Ventures) and Ric Elias (Founder and CEO of Red Ventures) were aware of his strategy and approved of it.

81. In or around December 9, 2019, Relator called in-house counsel to relay his concerns.

82. Following Relator's complaints, MyMove did **_not_** go through with this scheme. Relator assumes, but does not know, that MyMove paid any shortfall as required under the Minimum Guarantee.

### III. Violations of False Claims Act

83. In or around December 8, 2019, Relator reviewed the MoverSource Agreement and MyMove Agreement and spoke to various employees to determine if MyMove was involved in any other kinds of fraud.

13

84. In or around December 9, 2019, Relator discovered two fraudulent schemes. First, MyMove takes employee time that should be allocated to the MyMove Agreement (a *revenue*-share agreement) and instead allocates it to the MoverSource Agreement (a *profit*-share agreement). By doing so, MyMove is able hoist half of the costs of its employees onto USPS. Second, MyMove has secretly deducted some costs under its revenue-share agreement (the MyMove Agreement) to decrease its payments to USPS by *more than half*.

A. **Labor Allocation Fraud**

85. The MoverSource Agreement provides a ▓▓▓ *profit* split between USPS and MyMove, while the MyMove Agreement provides a ▓▓▓ *revenue* split between USPS and MyMove, respectively. This arrangement strongly incentivizes MyMove to allocate as much of its costs away from the MyMove Program—where MyMove is responsible for *all* the costs—and towards the MoverSource Program, where MyMove bears ▓▓ the costs.

86. In or around December 15, 2019, Relator discovered that MyMove does just that: MyMove fraudulently allocates items that must be allocated to the MyMove Agreement to the MoverSource Agreement.

87. Relator surveyed approximately 25 employees to determine how much time they spent on the MoverSource Program and the MyMove program.

88. Relator then compared the employees' self-reported allocations with the allocations reported by MyMove to USPS and discovered that MyMove grossly and fraudulently skewed employee time to over-allocate it to the MoverSource Program.

89. As an example, Relator discovered that MyMove allocated 90% of Jay Butler's (MyMove's former General Manager, before Matt Martin) time to the MoverSource Agreement and 10% to the MyMove Agreement, when in reality closer to the inverse was true: He spent, at

14

best, approximately 80% of his time on the MyMove Agreement and 20% of his time on the MoverSource Agreement.

90. As a result of this fraud, the payroll allocated to the MyMove Program dropped by half between 2016 and 2017, from approximately ▮▮▮ to approximately ▮▮▮, even as Red Ventures increasingly focused its employees' time on developing the MyMove Program. By 2018, payroll allocated to the MyMove Program was approximately ▮▮▮, and by 2019, approximately ▮▮▮.

91. From 2016 to 2019, the proportion of payroll costs allocable to the MyMove Program decreased even as the number of hours spent on the MyMove Program dramatically increased. At the same time, the proportion of payroll costs allocable to the MoverSource Program increased, even as the number of hours spent on the MoverSource Program dramatically decreased.

92. Based on the variance between employees' self-reported time allocations and the false time allocations fraudulently provided to USPS, Defendants have defrauded USPS of at least $1 million between 2016 and the present.

93. Relator raised concerns about this labor allocation fraud scheme to executives at Defendants, including, in or around December 2019, Matt Martin, but those executives ignored his concerns.

94. Additional facts supporting Defendants' knowledge of and complicity with this labor allocation fraud are within Defendants' control and a reasonable opportunity for discovery will provide evidentiary support.

**B.     Cost-Shifting Fraud**

95. The MyMove Agreement provides a ▮▮▮ *revenue* split between USPS and MyMove, respectively.

15

96. The development of the SDM Program—and the high costs associated with it—made the MyMove Agreement much less appealing to MyMove because MyMove is not able to deduct the costs of the MyMove Program under the terms of the MyMove Agreement.

97. In or around January 2017, MyMove wrote a memorandum discussing the issue of SDM Program costs under the MyMove Agreement. That memorandum recommended that MyMove seek an amendment of the MyMove Agreement with USPS to allow MyMove to deduct SDM Program costs.

98. In or around May 2018, MyMove executives, including Judy Frothingham, considered (over email) proposing an amendment to USPS to allow MyMove to deduct SDM Program costs from the revenue-share payments made to USPS.

99. The proposed amendment was never ratified by USPS.

100. By at least April 2018, before MyMove executives even drafted a proposed amendment, MyMove started secretly and fraudulently deducting the costs of the SDM program from its revenue-share payments under the MyMove Agreement. By doing so, MyMove effectively stopped sharing ▮ of its *revenue* with the USPS and instead started sharing only ▮% of its *profit* with USPS.

101. One email from MyMove executive Jeff Naylor suggests that MyMove began deducting SDM costs as early as 2017. He stated that:

> I looked at our 2017-2019 data for SDM ... to determine when we shifted to the ▮ of profit instead of straight revenue. I remember the change was made as one of Judy's initiatives and her understanding of the agreement/conversations. Looking at the month-to-month rev share, we shifted to ▮ of profit instead of ▮ of revenue in Apr 2018 and had an adjustment in Sep 2018, when we trued up from past payments to USPS that exceeded the ▮. **Overall, the share we've paid to [USPS] between 2017 and 2018 was ▮ of profit.**

16

102. MyMove's unilateral decision to secretly and fraudulent deduct costs from the revenue-share payment defrauded USPS of approximately $1 million.

103. Relator raised concerns about this cost-shifting fraud scheme to executives at Defendants, including, in or around December 2019, Matt Martin, but those executives ignored his concerns.

104. Additional facts supporting Defendants' knowledge of and complicity with this cost-shifting fraud are within Defendants' control and a reasonable opportunity for discovery will provide evidentiary support.

## CAUSES OF ACTION
### COUNT I – Violation of 31 U.S.C. § 3729(a)(1)(G)
### (Against All Defendants)

105. Relator repeats and re-alleges the allegations set forth in the preceding paragraphs, as if fully set forth herein.

106. The False Claims Act, 31 U.S.C. § 3729(a)(1)(G), imposes liability upon one who knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the United States, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money to the United States.

107. Defendants knowingly made, used, or caused to be made or used, false records and statements material to obligations to pay or transmit money to the United States, and knowingly concealed or knowingly and improperly avoided or decreased their obligations to pay or transmit money to the United States by misallocating employee time and business costs.

108. Defendants knew or should have known (as defined in 31 U.S.C. § 3801(a)(5)) that they had made, used, or caused to be made or used false records and statements material to their

obligations to pay money to the United States and that they knowingly and improperly avoided or decreased their obligations to pay or transmit money to the United States.

109. Each of the false records, statements, and omissions by Defendants was material to the decision of the United States to pay under its contracts with Defendants.

110. The United States was unaware of the foregoing circumstances and conduct of Defendants and, in reliance on said false and fraudulent records, statements, and omissions, accepted decreased payments from Defendants, and has been damaged.

111. Because of these false or fraudulent records, statements, and omissions by Defendants, the United States has been damaged in an amount to be determined at trial.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff-Relator demands and prays that judgment be entered against Defendants, jointly and severally, as to the federal claims as follows:

A. ordering that Defendants cease and desist from violating the False Claims Act, 31 U.S.C. §§ 3729 *et seq.*;

B. directing that each Defendant pay an amount equal to three times the amount of damages the United States has sustained because of such Defendant's actions;

C. directing that each Defendant, pursuant to the False Claims Act, 31 U.S.C. §§ 3729 *et seq.*, pay penalties of not less than $11,463 and not more than $23,331 for each such Defendant's violation of the False Claims Act;

D. granting Plaintiff-Relator the maximum amount allowed under 31 U.S.C. § 3729, and/or any other applicable provision of law;

E. directing that each Defendant, jointly and severally, pay Plaintiff-Relator's fees and costs, including attorneys' fees, as provided by the False Claims Act;

F. directing that each Defendant pay interest on all sums ordered paid;

G. ordering that Relator recover such other relief as the Court deems just and proper; and

H. granting such other and further relief as the Court deems just and proper;

## REQUEST FOR TRIAL BY JURY

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relator hereby requests a trial by jury.

Respectfully submitted the 27th day of April, 2020.

**POYNER SPRUILL LLP**

s/ John M. Durnovich
Andrew H. Erteschik
 N.C. State Bar No. 35269
John M. Durnovich
 N.C. State Bar No. 47715
301 S. College St., Suite 2900
Charlotte, NC 28202
aerteschik@poynerspruill.com
jdurnovich@poynerspruill.com
(704) 342-5344
*Counsel for Plaintiff Relator*


POLLOCK COHEN LLP

Adam L. Pollock
James Wiseman
60 Broad St., 24th Floor
New York, NY 10004
Adam@PollockCohen.com
(212) 337-5361
*Counsel for Plaintiff Relator*
(Admission pro hac vice pending)